UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ISIDRO GODINEZ-FLORES,

Petitioner,

v.

RANDY GROUNDS, Warden

Respondent.

Case No.  12-2726 JST (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Before the Court is the petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by Petitioner Isidro Godinez-Flores, challenging the validity of a judgment obtained against him in the Sonoma County Superior Court.  Respondent filed an answer to the petition.  Petitioner has not filed a traverse.  For the reasons discussed below, the petition is DENIED as to all claims and a certificate of appealability is DENIED.

## PROCEDURAL HISTORY

In early 2009, the Sonoma County District Attorney filed an information charging Petitioner with murder and attempted murder.  As to both counts the information alleged Petitioner personally used a firearm and, with respect to the attempted murder count, it alleged that Petitioner had inflicted great bodily injury.  On April 26, 2010, a jury rejected the murder charges but found Petitioner guilty of voluntary manslaughter and attempted voluntary manslaughter.  Clerk's Transcript (CT) at 1465-67.  The jurors also found the firearm and great bodily injury allegations to be true.  On August 10, 2010, the trial court sentenced Petitioner to thirteen years, four months in prison.  CT at 2313.

On January 19, 2011, Petitioner filed an appeal in the California Court of Appeal. On October 27, 2011, in an unpublished opinion, the Court of Appeal affirmed the judgment.  Ex. 8, People v. Godinez-Flores, 2011 WL 5118777 (Cal. App. Oct. 27, 2011).

On December 1, 2011, Petitioner filed a petition for review in the California Supreme Court. Ex. 9. Ex. 10. On January 4, 2012, the Supreme Court summarily denied the petition for review. Petitioner timely filed the instant petition on May 29, 2012. Respondent had filed his answer and a memorandum of points and authorities in support of his answer. Petitioner has not filed a traverse.

## STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal.[1]

> On January 24, 2009, shortly before 10:00 p.m., Santa Rosa Police Officer Ryan Corcoran was dispatched to 939 Aston Avenue in order to investigate a report that someone had been shot . When Corcoran arrived, he found about 30 people gathered toward the end of a driveway near a man, later identified as Jose Chavez, FN2 who was lying nearly motionless on the ground. . . . Officer Corcoran . . . noticed that another man, later identified as Jose's brother Julio Chavez, had been shot in the arm. Authorities investigating the crime scene found cartridge casings and a small sword in the area where Jose had been shot. A second similar sword was found in a different area away from the main scene.

> FN2 The victims and many of the witnesses share the same last names. For clarity, we will sometimes identify them by their first names.

> Police quickly identified appellant as the shooter and determined that he might have fled the area. They notified authorities in the Southern California community of El Monte to watch for appellant and his vehicle. Appellant was arrested by police in El Monte the following day. A loaded handgun with appellant's fingerprints on it was found inside appellant's truck.

> Jose Chavez died on January 27, 2009. He had been shot three times in the chest and once in the back of the head. Any one of the shots could have caused his death.

> Julio Chavez suffered a gunshot wound that shattered one of the bones in his right arm. He experienced nerve damage and needed surgery to repair his arm.

> . . .

> The case proceeded to trial where the prosecution relied primarily on testimony from Julio Chavez. He stated the shooting was the product of a family dispute.

---

[1] This summary is presumed correct. See Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

Appellant, Jose, and Julio are cousins who all grew up in the same small rural community in Mexico. At the time of the crime, Jose and Julio lived in the same apartment complex on Aston Avenue in Santa Rosa while appellant lived nearby with his common-law wife and their children.

In January 2009, appellant spoke with Julio on the phone. Appellant asked if Julio knew Julio's father was sick and whether he needed any money. Julio said he did know and that they did not need anything, but appellant kept inquiring in a way that made Julio think appellant was mocking his family. Julio asked appellant not to get involved in his family matters. The two men began to argue. Appellant insulted Julio using a word that translates as an "asshole" and threatened to come to his house and "beat" him. Julio hung up.

About two weeks later on January 24, 2009, Julio was leaving his apartment when he saw appellant standing with Enrique Chavez and Miguel Angel near appellant's truck. Miguel called Julio over. He gave Julio a beer and asked why he and appellant were angry with each other. Julio denied being angry, but he and appellant began to argue again. As the argument escalated, appellant threw a beer can into Julio's face. Julio struck appellant back and the two began to fight. Miguel and Enrique separated them but appellant and Julio continued to yell at each other. Appellant threatened to kill Julio saying he was going to bring a gun and "turn [him] into pieces with bullet shots." Appellant and Miguel got into appellant's truck and left. Julio called his brother Jose.

Jose arrived about 10 minutes later and Julio told him that appellant had threatened to shoot and kill him. Jose was upset.

Appellant returned to the apartment complex about 15 minutes later. He parked his truck so that it faced the complex's exit but remained inside. Jose walked over to speak with appellant. Julio, Miguel and Enrique gathered near the rear of appellant's truck. Jose and appellant began to argue. After a few minutes appellant produced a gun and started shooting. Jose fell to the ground. Appellant then got out of his truck, put his foot on Jose's shoulder, and shot Jose in the head.

Appellant turned toward Julio and pointed his gun at him. Julio ran but appellant chased him. He fired three shots one of which hit Julio in the arm.

The prosecution also presented testimony from Miguel Angel and Enrique Chavez who confirmed Julio's testimony in some respects, but contradicted it in others. For example, Miguel testified that during the initial altercation on January 24, 2009, Julio was the aggressor and that he threw a beer can at appellant. Miguel also stated that when Jose went up to appellant's truck after appellant returned, it appeared that Jose had something shiny in his hand. Enrique by contrast said he never saw Jose with any sort of weapon.

United States District Court
Northern District of California

Importantly, Miguel testified that the bad feelings between appellant and the Chavez brothers were more serious than they might otherwise have appeared. Miguel said Jose told him he was upset with appellant. Jose asked Miguel to take appellant to a park, to let Jose know, and then leave appellant there. Miguel did not know if Jose meant this as a threat, but he was concerned enough that he called appellant and told him about it.

The prosecutor also presented testimony from two witnesses who were not directly involved in the incident. Ernesto Garcia lived in the Aston Avenue apartment complex and he knew Jose and Julio. On the evening in question, Garcia was on his porch with a friend when he heard Jose arguing with someone in a truck. Garcia heard Jose tell the person in the truck not to point his gun at him followed about a second later by gunshots. The man got out of his truck and fired a shot at Jose's head while he was on the ground. He then turned and fired several shots at Julio.

Gustavo Rodriguez, who was visiting Garcia that evening, testified similarly. He saw a man in a truck talking with a man outside. The man outside did not do anything aggressive and he did not have a weapon. The man inside fired shots at the man outside. The man outside fell to the ground. The man inside got out, ran toward the back of the truck, and fired at three people who had gathered there.

Appellant testified in his own defense. He put his relationship with the Chavez brothers, and Jose, in particular, into further context.

Appellant described several incidents that made him wary of Jose. The first occurred when they were both still growing up in Mexico. Jose shot and killed his own younger brother while playing with a gun. Another incident occurred just after appellant came to the United States in 1997. One day while appellant and Jose were working at the same farm, appellant saw Jose threaten another worker with a knife. A third incident happened in 2002. While Jose and appellant were driving someplace, appellant noticed Jose was armed with a knife. Jose said he planned to kill the former spouse of his live-in companion.

Appellant also described the disputed phone call differently. According to appellant, he simply called to ask how his uncle was doing. Julio got upset and told him: "We don't like you. Don't go and cross our path, because whenever we see you, we are going to thoroughly bust you up."

Two days later, appellant spoke with Miguel Angel who told him things "aren't as calm as you might think. . . ." Miguel said Jose had asked him to take appellant to a park, leave him there, and then call Jose and Julio. They would then do "what needed to be done." Appellant concluded something was going to happen to him and that there was no way he could avoid it.

Appellant's version of the events on the day of the shooting also differed significantly from that presented by Julio. Appellant said he was in the parking lot of the apartment complex talking with Miguel and Enrique when Julio came up, called him a fucker, and pushed him. Appellant punched Julio back and knocked him down. Miguel and Enrique broke up the fight. Julio went inside and came back out talking on his cell phone. Enrique said Julio was calling his brother and that things were "going to get ugly. . . ." Appellant could hear Julio yelling into his phone saying "you need to come home right away." Appellant decided to leave and as he did, he could hear Julio say "It doesn't matter if you leave, we'll meet again in a minute." Appellant interpreted this to mean that they would come after him and kill him.

Appellant went home. He retrieved a gun, kissed his daughters, and then returned to Aston Avenue thinking he would rather face Julio and Jose there than at his own home.

When appellant arrived, Jose walked toward him. Jose invited appellant to get out of his truck so he could "beat the shit out of [him]." Appellant declined. He asked Jose why he had asked Miguel to take him to a place where he could be killed. Jose acknowledged doing that and said, "But you know that I can kill you whenever I feel like it." At that point, Jose hit appellant on the left side of his head. Appellant felt blood. He reached for his gun and fired four times. It was dark and he did not know if he hit Jose. Jose fell.

Appellant remembered that he had seen Julio behind his truck. He got out and fired two shots at him. When Julio turned and ran, appellant might have fired a third shot.

Appellant turned to Miguel and Enrique and told them, "you guys didn't see anything." He then returned home, gathered his wife and children, dropped them off at a relative's house, and fled to Southern California.

Appellant also called several character witnesses to testify on his behalf.

Stephen Hill, the general manager of a vineyard where appellant worked, said appellant was a skilled and conscientious worker. Hill never saw any evidence that appellant was violent.

Hill's son Ned agreed that appellant was a good worker and that there was no evidence that he was a violent person.

Javier Flores, who worked with appellant said he had a good reputation for peacefulness. Flores also said that in December 2008, he was present when appellant received a phone call about two young men who wanted to hurt him.

Martin Ocegueda stated he worked with Jose Chavez in the past.  Ocegueda described an incident where Jose threatened him with a box cutter.  Ocegueda believed it was dangerous to get involved with Jose.

Maria Verduzco worked with appellant for one year.  She said appellant had a reputation as a good and honest person.  Verduzco also knew Jose Chavez and said he had a reputation for being a violent man.

Appellant's brother Jose Godinez–Flores agreed Jose was a violent person.  He described an incident where Jose had used a sword to knock two beer cans out of his hand at a party.

Godinez-Flores, 2011 WL 5118777, at *1-4.

# DISCUSSION

## I.   Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's]

cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. In other words, federal habeas relief is available only if the state court's application of federal law is "so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'" Nevada v. Jackson, __ U.S. __, 133 S. Ct. 1990, 1992 (2013) (citing Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 786 (2011)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim. In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. Plascencia, 467 F.3d at 1198; Himes, 336 F.3d at 853.

Here, as noted, the California Supreme Court summarily denied Petitioner's petition for review. The Court of Appeal, in its opinion on direct review, addressed the first claim Petitioner raises in his federal petition. See Respondent's Ex. 5. Thus, the Court of Appeal was the highest state court to have reviewed that claim in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

## II.    Petitioner's Claims

In his petition, Petitioner asserts two grounds for relief: (1) the jury was misinstructed on the doctrine of self-defense, violating his right to due process; and (2) ineffective assistance of counsel.

### A. Self-Defense Instruction

Petitioner contends that the trial court failed to instruct the jury correctly on the doctrine of self-defense. Petitioner states that the evidence showed that the victim attacked him with a sword and Petitioner shot him in self-defense. He contends that the instruction telling the jury that self-defense was not available unless Petitioner "used no more force than was reasonably necessary," is a misstatement of California law.

#### 1. Court of Appeal Opinion

The Court of Appeal rejected this claim as follows:

The trial court instructed the jury on principles of self-defense using CALCRIM No. 505. As is relevant here, the court instructed the jurors as follows:

"The defendant is not guilty of murder or voluntary manslaughter or attempted murder or attempted voluntary manslaughter if he was justified in killing or attempting to kill someone in self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if:

"(1) The defendant reasonably believed that he or his family was in imminent danger of being killed or suffering great bodily injury.

"(2) The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger.

"AND

"(3) The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.  The defendant must have believed there was imminent danger of great bodily injury to himself or his family.  Defendant's belief must have been reasonable and he must have acted only because of that belief."

Appellant concedes the first two elements set forth in CALCRIM No. 505 correctly state the applicable law.  But he contends the court should not have instructed on the third element because "[t]here is no reason to suggest to the jury that self-defense becomes unavailable if the defendant used more force than was in fact 'reasonably necessary'. . . ."  Appellant bases his argument primarily on a comment made in Forecite which states that the third element of CALCRIM No. 505 "is a misstatement of the law of self defense."  (1 Forecite (2006) Homicide, § F 505.5, p. 5–19.)

Appellant's (and Forecite's) argument on this point is simply incorrect.  The courts of this state have long held that the right of self-defense is limited to the use of such force as is reasonable under the circumstances. . . . As Division Four of this court explained recently, "'The principles of self-defense are founded in the doctrine of necessity.  This foundation gives rise to two closely related rules . . .

First, only that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified.  [Citation.]  Second, deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury. . . . Under these two principles a person may be found guilty of unlawful homicide even where the evidence establishes the right of self-defense if the jury finds that the nature of the attack did not justify the resort to deadly *force or that the force used exceeded that which was reasonably necessary to repel the attack*. [Citations.]'"  (People v. Hardin, (2000) 85 Cal. App. 4th 625, 629–630, citing People v. Clark, 130 Cal. App. 3d 371, 380, italics added.)

As for Forecite, it appears the comment in question is based primarily on the fact that when our Supreme Court discussed principles of self-defense in People v. Humphrey (1996) 13 Cal. 4th 1073, 1082–1083, it did not mention the principle that a defendant may use no more force than is reasonably necessary.  (Forecite, § F 505.5, at 5–19–20.)  While it is true that this principle was not discussed in Humphrey, it is axiomatic that cases are not authority for propositions that are not considered.  (People v. Jennings (2010) 50 Cal. 4th 616, 684.)  Indeed, the same day our Supreme Court issued the Humphrey decision, it issued a different decision in which it reaffirmed the principle that a defendant may use no more force than is reasonably necessary.  (See People v. Minifie, 13 Cal. 4th at 1065 .)  We reject appellant's (and Forecite's) argument that it is improper to instruct jurors on that principle.

As a back-up argument, appellant argues that if the principle articulated in the third element of CALCRIM No. 350 [sic] is correct, it applies "only to the right to use force to defend against a non-deadly crime."  Appellant has not cited any case that articulates the rule he describes and the law in fact supports the opposite conclusion.  Several cases have applied the rule that a defendant may only use as much force as is reasonable under the circumstances where the defendant was forced to defend against what he believed to be a deadly attack.  (See, e.g., People v. Minifie, 13 Cal. 4th at 1061–1062, 1065; [principle applied where the defendant was afraid he would be killed by the persons against whom he was defending]; People v. Welch, 137 Cal. App. 3d at 838, 840 [principle applied where the defendant thought his attacker might kill him].)  We reject appellant's argument on this point.

9

As yet another back-up argument, appellant contends that "[i]f some instruction on reasonable necessity was permissible, that instruction was required to remind the jury that it is not whether the force used was in fact reasonably necessary, but whether it would reasonably have appeared to the defendant to be necessary." We reject this argument because that principle was conveyed to the jurors. CALCRIM No. 505 instructed the jurors that for self-defense to apply, the "*defendant must have believed* there was imminent danger of great bodily injury to himself or his family" and that *"[d]efendant's belief must have been reasonable. . . . "* (Italics added.) There was no error on this ground.

We conclude the trial court correctly instructed the jurors on self-defense.

Godinez-Flores, 2011 WL 5118777, at *6-7.

Because the Court of Appeal found that the instruction correctly embodied California law, it did not reach Petitioner's argument that the instruction was prejudicial. Id. at 7, n.6.

### 2. Federal Authority and Analysis

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). See, e.g., Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir. 1998) (state law determination that arsenic trioxide is a poison as a matter of law, not element of crime for jury determination, not open to challenge on federal habeas review).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the erroneous instruction by itself so infected the entire trial that the resulting conviction violates due process. Estelle, 502 U.S. at 72; see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right]."). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Estelle, 502 U.S. at 72.

Where a state court expressly held that a jury instruction correctly set forth state law, it is not the province of a federal habeas court to reexamine the state-court determination that rests on state-law grounds. Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009) (once federal habeas court concludes that state court reasonably found an instruction was unambiguous, federal habeas court should end its inquiry). [A] state

court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam) (citing Estelle, 502 U.S. at 67-68).

Even if error occurs, habeas relief is not available unless the error had a substantial or injurious effect on the verdict.  Calderon v. Coleman, 525 U.S. 141, 146 (1998) (per curiam)(citing Brecht v. Abrahamson, 507 U.S. 619 (1993)).

In the present case, the California Court of Appeal undertook a thorough analysis of the third prong of the self-defense instruction that Petitioner challenged and reasonably found that it was a correct articulation of state law.  On federal habeas review, the state court's interpretation of its own state law is binding on this Court.  Because the instruction was correct, Petitioner's due process rights were not violated.

Respondent proffers the argument that, even if the instruction was improper, Petitioner cannot show prejudice.  However, like the state Court of Appeal, this Court need not address prejudice since there was no constitutional error.

Because the state court's opinion was not objectively unreasonable, habeas relief on this claim is denied.

**B. Ineffective Assistance of Counsel**

On direct appeal, Petitioner claimed that, by requesting the self-defense instruction and not objecting to the improper wording, trial counsel did not forfeit Petitioner's right to challenge the instruction in post-trial proceedings.  Alternatively, Petitioner argued that, if an objection was required to preserve his right to challenge the instruction on appeal, defense counsel rendered ineffective assistance by failing to object.  Because the state court addressed the merits of the instructional error argument, it did not address whether Petitioner's right to appeal the instruction was forfeited.  Godinez-Flores, 2010 WL 5118777, at *7 n.6.

In his federal petition, Petitioner states that he raises the ineffective assistance of counsel claim "as a backup argument" because counsel should have been aware that the self-defense instruction was flawed.  Although Petitioner states this is a "backup argument," he presents it as an actual claim, and the Court addresses it as such.  Because

United States District Court
Northern District of California

the state court did not address this claim, this Court conducts an independent review of the record to determine if the denial of this claim was an objectively unreasonable application of <u>Strickland</u>.  <u>See</u> <u>Plascencia</u>, 467 F.3d at 1198.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  <u>Id.</u>

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  <u>Id.</u> at 687–88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 694.

Because the self-defense jury instruction was proper, counsel's performance was not deficient for requesting it or for failing to object to its wording.  <u>See</u> <u>United States v. Oplinger</u>, 150 F.3d 1061, 1072 (9th Cir. 1998) <u>overruled on other grounds in</u> <u>United States v. Contreras</u>, 593 F.3d 1135 (9th Cir. 2010) (per curiam) (no ineffective assistance of counsel claim for failing to object to proper jury instruction); <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1273 (9th Cir. 2005) ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection.").

Therefore, based on an independent review of the record, the Court determines that the state court's denial of this claim was not an objectively unreasonable application of clearly established federal law.  Habeas relief on this claim is denied.

## III.    Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny a

certificate of appealability.  See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability is denied.

## CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED**.

Dated: July 7, 2014

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

13